USDC SDNY
DOCUMENT
ELECTRONICALLY FI...
DOC #: _____
DATE FILED: 7/13/06

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
**CANADIAN AVIATION SIMULATOR**                     :
**SERVICES, INC.,**                                 :
                                                    :
                     **Petitioner,**                :     **OPINION AND ORDER**
                                                    :
         **- against -**                            :
                                                    :     **06 Civ. 1911 (SAS)**
**THALES TRAINING AND SIMULATION,**                 :
**LTD.,**                                           :
                                                    :
                                                    :
                     **Respondent.**                :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

Canadian Aviation Simulator Services, Inc. ("CASS") petitions to

vacate the final arbitral award (the "Final Award") issued by the International

Chamber of Commerce ("ICC") on or about November 21, 2005, in a dispute

between CASS and Thales Training and Simulation, Ltd. ("TTS") arising out of a

purchase agreement. TTS cross-moves to confirm the award. For the following

reasons, CASS's petition to vacate the award is denied, and TTS's cross-motion to

confirm the award is granted.

## II.    BACKGROUND

-1-

## A. The Purchase Agreement

CASS, a Canadian company, was founded in 1999 by its Chief Executive Officer, Thomas K. Edmison.[1] Edmison founded the company to "exploit[] the need for flight training services in Western Canada"[2] by "providing . . . flight simulation training to the global airline industry."[3] TTS, a corporation organized under the laws of the United Kingdom, is a "major supplier of full flight simulator systems and is a subsidiary of the Thales Group, a Paris based multinational conglomerate."[4] The two parties entered into a Purchase Agreement (the "Agreement") on November 18, 2001, providing for the construction and delivery by TTS of an Airbus A320 Flight Simulator to CASS for US

---

[1]    Declaration of Thomas K. Edmison, CASS Chief Executive Officer ("Edmison Decl.") ¶ 3.

[2]    *Id.*

[3]    Petitioner's Memorandum in Support of Petition to Vacate Arbitration Award ("Pet. Mem.") at 2.

[4]    4/6/05 Interim Award of the International Chamber of Commerce ("ICC") in the International Court of Arbitration ("ICA") in the Matter of an Arbitration in Accordance with the Rules of the International Chamber of Commerce between Canadian Aviation Simulator Services Inc. and Thales Training and Simulation Ltd. ("Interim Award"), Ex. A to Affidavit of Robert Weiner, counsel for TTS ("Weiner Aff."), ¶ 4.

$12,179,000.[5]

In the months preceding the signing of the Agreement, CASS experienced significant difficulty obtaining financing for the simulator.[6] However, about a week before both parties signed the Agreement, CASS informed TTS that CASS "would be obtaining financing from [the Bank of Nova Scotia ("BNS")]," and that CASS was "now prepared to exercise [its] option [to purchase the simulator] and sign the purchase agreement."[7] TTS claims that after receiving CASS's news that it would be obtaining financing from BNS, its representative flew to Canada "for the purpose of executing the [Agreement]," that the Agreement "was reviewed by CASS's attorneys prior to its execution," and that those attorneys told CASS that it did not have any "wiggle room."[8] TTS claims that S.R. Found, then a potential investor in CASS and its eventual Chief Financial Officer,[9] and Edmison both "read the Agreement before they signed it and that

---

[5]     See 11/18/01 Purchase Agreement between Thales Training and Simulation Ltd. and Canadian Aviation Simulator Services, Ex. A. to Petition to Vacate Arbitration Award ("Petition"), at 11.

[6]     See Interim Award ¶¶ 37-41.

[7]     Id. ¶ 88.

[8]     Id. ¶ 61.

[9]     See id. ¶¶ 16, 26.

-3-

both of them understood its terms."[10]  In contrast, CASS claims that TTS's

representative flew to Canada to apply "increased pressure" to sign the Agreement

before the November 30th deadline, and that the representative "urged Found and

Edmison to execute the purchase agreement despite their obvious concern that not

only was CASS's purchasing financing not yet finalized, but its most promising

partner, BNS, appeared to be losing interest in the transaction."[11]

CASS "believ[ed TTS's] statements [that] the transaction would

collapse if the Purchase Agreement was not executed by the November 30, 2001

deadline."[12]  CASS claims that "TTS knew at the time the Purchase Agreement

was executed that CASS had not yet obtained purchase financing," and that TTS

"understood . . . that CASS would essentially default on the terms of the Purchase

Agreement at the moment the parties executed it."[13]  CASS also asserts that after

the Agreement was signed, TTS approved a modification of it "by committing to

accept a lease transaction (and not a sale), as well as a CASS financing proposal

---

[10]   *Id.* ¶ 61.

[11]   *Id.* ¶ 62.

[12]   *Id.*

[13]   *Id.*

-4-

that limited TTS's contingent liability to $1 million for the duration of the lease."[14]

TTS counters that although the parties were "engaged in a negotiation regarding

the possible restructuring of the . . . Agreement," the Agreement itself was not

modified.[15]  The Agreement as signed by the parties on November 18, 2001 "did

not require TTS to assist CASS in obtaining financing" for the simulator purchase,

and "CASS's obligations under the Agreement were not contingent upon its

obtaining financing."[16]

## B.    The Arbitration

Pursuant to the Agreement's arbitration clause, the parties

commenced arbitration in April of 2003.[17]  The Secretary General of the

International Court of Arbitration ("ICA") of the ICC appointed Richard J. Davis,

Michael T. Tomaino, and Steven A. Hammond as the Arbitral Tribunal to hear the

---

[14]     *Id.* ¶ 74.

[15]     *Id.*

[16]     *Id.* ¶ 71.

[17]     *See* Purchase Agreement ¶ 17 ("In the event of any dispute
whatsoever arising from the terms and conditions of the Contract, the parties
hereto undertake to make every effort to reach an amicable settlement.  Failing
such a settlement the dispute shall be finally settled in New York, USA under the
'Rules of Conciliation and Arbitration of the International Chamber of Commerce'
by one or more Arbitrators appointed in accordance with the Rules.").

-5-

case.[18] Hammond was appointed Chairman of the Tribunal.[19] At a preliminary

conference, both CASS and TTS confirmed that neither was aware of any reason

for challenging the appointment of any member of the Tribunal.[20] Hearings began

on August 16, 2004, and included the testimony of all of the major participants in

the deal.[21] Both parties expressed their desire that an interim award be issued by

the Tribunal on the issues of liability and, to the extent the Tribunal found

appropriate, on damages, in order to avoid the expense of retaining damages

experts.[22] Accordingly, the Interim Award was issued on April 6, 2005.[23] The

Tribunal found entirely for TTS on the issue of liability, concluding both that TTS

had not breached the Agreement, and that CASS's failure to make payments due

under the original Agreement was a material breach.[24] No decision was rendered

as to damages.[25]

---

[18]   *See* Interim Award ¶ 80.

[19]   *Id.*

[20]   *Id.* ¶ 81.

[21]   *Id.* ¶ 83.

[22]   *Id.*

[23]   *Id.* at 40.

[24]   *See id.* ¶ 118.

[25]   *See id.* ¶ 117.

On June 16, 2005, Hammond sent a letter to the ICC stating that his

Paris colleagues at Hughes Hubbard & Reed L.L.P. ("Hughes Hubbard") had

advised him that "they were hired yesterday to represent the interests of . . . [TTS]

in a matter wholly unrelated" to the CASS/TTS arbitration, and stating that "this

[was] not a matter in which [he had or would have] any personal involvement."[26]

Upon receipt of this letter, Edmison wrote to the ICC requesting that Hammond be

removed as chairman of the Tribunal.[27] Edmison argued that Hammond should be

removed because of "reported instances of bribery and corruption associated with

Thales (e.g. Taiwan frigate case, South African Zuma case, World Bank and the

suspicious timing of Mr. Hammond's declaration of Thales retaining Hughes

Hubbard & Reid [sic], Paris)."[28]

Three days later, Hammond responded by submitting his resignation

from the Arbitral Tribunal to the ICC.[29] In his letter of resignation, Hammond

---

[26]     6/16/05 Letter from Steven A. Hammond, Tribunal Chairman, to
Matthew Secomb, Counsel, Secretariat of the ICC ("Hammond Letter"), Ex. 8 to
Weiner Aff., at 1.

[27]     *See* 7/5/05 Letter from Thomas K. Edmison to Matthew Secomb and
Carl F. Salans, ICC Counsel ("July 5 Edmison Letter"), Ex. 9 to Weiner Aff., at 1.

[28]     *Id.*

[29]     *See* 7/8/05 Letter from Steven A. Hammond to Matthew Secomb
("Hammond Resignation"), Ex. 10 to Weiner Aff., at 1.

"categorically reject[ed]" the allegations of partiality in Edmison's letter, and stated that he was resigning "most reluctantly," noting that the letter would "make it impossible for [Hammond] to carry out effectively [his] role" as Tribunal Chairman.[30] By way of further response to Edmison's allegations, Hammond informed the ICC that the Interim Award was dated April 6, 2005, "a date which was long after the unanimous Tribunal had concluded its deliberations and after the draft award had been submitted to the ICC Court," and which was also "well before the Paris office of Hughes Hubbard was contacted by an affiliate of the Respondent [TTS] about the *potential* retention that gave rise to [Hammond's] disclosure."[31]

Following Hammond's letter, and in response to the ICC's request for comments, Edmison argued that "the arbitration proceeding ha[d] been irreparably compromised as a result of the actions of Mr. Hammond's law firm," and that the

---

[30]    *Id.*

[31]    *Id.* (emphasis added). Further correspondence from TTS revealed that a retention had only been discussed at the time of Hammond's June 16 letter. *See* 8/23/05 Letter from Robert A. Weiner, counsel for TTS, to Horacio Grigera Naón, Michael T. Tomaino, and Richard J. Davis, ICC Arbitral Tribunal Members ("August TTS Letter"), Ex. 14 to Weiner Aff., at 1; Reply Declaration of Christine Guerrier, counsel for TTS ("Guerrier Reply Decl."), ¶ 7 ("[O]n or about June 8, 2005 . . . [Thales] had contacted the Paris office of Hughes Hubbard about serving as replacement counsel [for Thales Air Defence, a Thales subsidiary].").

-8-

ICC should "reconstitute the entire [arbitral] panel, either in accordance with the original nominating process or by appointing a new independent sole arbitrator . . . with the direction that the [arbitration] proceedings [up to that time] be repeated before the reconstituted arbitral tribunal."[32] On August 8th, the ICC informed Edmison and Weiner that it had accepted Hammond's resignation, and had appointed Dr. Horacio A. Grigera Naón, the former Secretary General of the International Court of Arbitration, as Hammond's replacement.[33] Neither CASS nor TTS had any influence in the choice of Dr. Naón as the replacement Chairman. Edmison then wrote a letter to all three of the ICC Tribunal members, stating that "it [was] CASS's position that the entire prior proceeding should be repeated unless it c[ould] be established by Thales (based on a high onus of proof) that there was no retainer of and no communications whatsoever with any member of [the Hughes Hubbard law firm] by Thales or any of its related entities concerning

---

[32]     7/15/05 Letter from Thomas K. Edmison to Pui Ki Ta, Assistant Counsel, Secretariat of the ICC ("July 15 Edmison Letter"), Ex. 11 to Weiner Aff., at 1.

[33]     *See* 8/8/05 Fax from Matthew Secomb to Thomas K. Edmison, Robert A. Weiner, and Carolyn Traister Schiff, counsel for TTS ("Secomb Fax") (enclosing Dr. Naón's *curriculum vitae*), Ex. 12 to Weiner Aff.

-9-

any such retainer prior to April 5, 2005."[34]   Edmison suggested that the Tribunal

"convene a meeting with the parties to schedule a full hearing on this issue."[35]

TTS responded, saying that though TTS did "not oppose a review of the

proceedings . . . TTS [did] not believe that a hearing [was] necessary or

appropriate."[36]   TTS's letter also informed the ICC that Hammond had been

mistaken in his June 16 letter notifying the ICC of his potential conflict, as Hughes

Hubbard "had been *contacted but not retained*" at the time of the letter.[37]

A teleconference took place on September 22, 2005, with CASS,

TTS, and the entire Arbitral Tribunal participating.[38]   The Tribunal gave both

parties a "full opportunity to be heard" regarding CASS's claims of impropriety.[39]

---

[34]   8/18/05 Letter from Thomas K. Edmison to Horacio Grigera Naón, Michael T. Tomaino, and Richard J. Davis ("August 18 Edmison Letter"), Ex. 13 to Weiner Aff., at 1.

[35]   *Id.* at 2.

[36]   8/23/05 Letter from Robert A. Weiner to Horacio Grigera Naón, Michael T. Tomaino, and Richard J. Davis ("August 23 Weiner Letter"), Ex. 14 to Weiner Aff., at 1.

[37]   *Id.* at 2 (emphasis added).

[38]   11/21/05 Final Award in the Arbitration between Canadian Aviation Simulator Services Inc. and Thales Training and Simulation Ltd. ("Final Award"), Ex. 15 to Weiner Aff., ¶ 22.

[39]   *Id.* ¶ 14.

-10-

During the conference, CASS's counsel did not allege that "the record was incomplete or that there was a basis for challenging the remaining two original arbitrators."[40]

The Arbitral Tribunal, chaired by Dr. Naón, issued its Final Award on November 21, 2005. The award stated that "the Interim Award [was] a final award on the merits [of the contract dispute] in connection with the matters, claims and disputes resolved by it."[41] Additionally, the Tribunal determined in the Award that there were

> no grounds [on which] to conclude, and . . . no evidence [of which the Tribunal was aware], that Mr. Hammond's law firm had any economic or other relationship with TTS or any of its affiliates before the completion of the deliberations leading to an unanimous draft Interim Award, that was achieved by the end of February 2005, or the rendition of such Interim Award on April 6, 2005; and . . . [was] satisfied as to the regularity and integrity of the record on the basis of which such Interim Award was rendered.[42]

The ICC forwarded the Final Award to CASS and TTS on December 9, 2005, thereby closing the arbitration proceedings.[43]

---

[40]    *Id.*

[41]    *Id.* ¶ 33.

[42]    *Id.* ¶ 31.

[43]    Weiner Aff. ¶ 33.

-11-

## C. CASS's Improper Relationship Claims

In its petition to vacate the award and accompanying memoranda,

CASS outlines several allegedly improper relationships which it claims should

have been disclosed at the commencement of the arbitration proceedings. The

motion reiterates the impropriety of Hammond's disclosure and attaches all of

Edmison's letters to the ICC. Chief among the alleged relationships is the role of

Andrew Hibbert at Thales, a former Hughes Hubbard attorney who became

Thales' General Counsel in January of 2005.[44] Hibbert worked at Hughes

Hubbard as an associate from 1979 until 1984.[45] He became a senior vice

president at Alstom, a major Hughes Hubbard client, in 1998, which position he

held until he moved to Thales in January of 2005.[46] Hibbert left Thales in

December of 2005.[47] CASS claims that Hibbert "served in a senior capacity" with

Candace Beinecke, an Alstom Director and the Hughes Hubbard Chairwoman,

while he was at Alstom, and that this, coupled with the fact that Hibbert was

---

[44] *See* 12/5/05 Letter from David R. Haigh, counsel for CASS, to ICC Tribunal ("Haigh Letter"), Ex. J to Petition, at 1.

[45] *Id.*

[46] *Id.* at 2.

[47] *See* Declaration of Christine Guerrier, counsel for TTS ("Guerrier Decl."), ¶ 8.

"joining Thales . . . following a significant tenure" at Alstom, "one of Hughes

Hubbard's most important clients," would be enough "under any measure of

reasonableness" to cause a party "armed with these facts" to request that

Hammond resign from the Arbitral Tribunal.[48]

CASS now petitions for vacatur of the arbitration award or, in the

alternative, for discovery and an evidentiary hearing into the "scope and nature of

the validity" of the arbitration, based on its claim that the alleged relationships

were both improper and never disclosed.[49] TTS opposes CASS's request for

discovery and an evidentiary hearing and cross-moves for confirmation of the

award.

## III.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") states that "the United States

court in and for the district wherein [an arbitration] award was made may make an

order vacating the award upon the application of any party to the arbitration . . .

where there was evident partiality or corruption in the arbitrators, or either of

---

[48]     Petition at 8.

[49]     Petitioner's Reply Memorandum of Law In Support of Petition to
Vacate Arbitration Award ("Pet. Reply Mem.") at 10.

-13-

them."[50] "'Arbitration awards are subject to very limited review in order to avoid

undermining the twin goals of arbitration, namely, settling disputes efficiently and

avoiding long and expensive litigation.'"[51] "The showing required to avoid

summary confirmation of an arbitration award is high,"[52] and in cases where one

party asserts evident partiality, "'the burden of proof . . . rests upon the party

asserting bias.'"[53] "[A] court is required to confirm [an arbitration] award unless a

specific ground for vacatur exists."[54]

## A.   Evident Partiality

To show evident partiality, "the challenging party has the burden of

showing that 'a reasonable person would have to conclude that an arbitrator was

---

[50]   9 U.S.C. § 10(a).

[51]   *Willemijn Houdstermaatschappij, BV v. Standard Microsystems
Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (quoting *Folkways Music Publishers, Inc. v.
Weiss*, 989 F.2d 108, 111 (2d Cir. 1993)).

[52]   *Id.*

[53]   *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, A.G., 579 F.2d
691, 700 (2d Cir. 1978) (quoting *Reed & Martin, Inc. v. Westinghouse Electric
Corp.*, 439 F.2d 1268, 1275 (2d Cir. 1971)).

[54]   *Skyview Owners Corp. v. SEIU, Local 32B-J*, No. 04 Civ. 4642, 2004
WL 2244223, at *4 (S.D.N.Y. Oct. 5, 2004). *See also Saxis S.S. Co. v. Multifacs
Int'l Traders, Inc.*, 375 F.2d 577, 581-82 (2d Cir. 1967).

-14-

partial to one party to the arbitration.'"[55] "'[F]ailure to disclose a material relationship with one of the parties can constitute evident partiality requiring vacatur of the award' under the FAA."[56] However, the Second Circuit has "not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information."[57] In fact, the Second Circuit has pointed to the "obvious possibility, alluded to by Justice White in *Commonwealth Coatings* that a 'suspicious or disgruntled party can seize' upon an undisclosed relationship 'as a pretext for invalidating the award.'"[58] Additionally, the Second Circuit has noted that since "[c]ourts are usually reluctant to impugn the decisions of a jury because of claims of subsequently discovered bias . . . even greater caution is justified when the decision to be set aside is the product of the theoretically informal, speedy, and inexpensive process of arbitration, freely

---

[55]     *Skyview*, 2004 WL 2244223, at *4 (quoting *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984)).

[56]     *Id.* (quoting *Lucent Techs. Inc. and Lucent Tech. GRL LLC v. Tatung Co.*, 379 F.3d 24, 28 (2d Cir. 2004)).

[57]     *Andros*, 579 F.2d at 700.

[58]     *Id.* (quoting *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 151 (1968) (White, J., concurring)).

-15-

chosen by the parties."[59]

With regard to undisclosed relationships, no per se rule exists which requires vacatur of an award if an undisclosed relationship is discovered.[60] Courts have observed that "[e]xpertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw," but even when taking this difficulty into account, "an arbitrator 'cannot be expected to provide the parties with his complete and unexpurgated business biography.'"[61] Where dealings exist between an arbitrator and a party which "might create an impression of possible bias, they must be disclosed,"[62] but "[t]he 'appearance of bias' does not

---

[59]    *Id.* at 701.

[60]    *See Skyview*, 2004 WL 2244223, at *19 (refusing to vacate an arbitration award in part because the business relationship between the arbitrator and one of the parties terminated long before the arbitration proceeding took place); *Sanford Home for Adults v. Local 6, IFHP*, 665 F. Supp. 312, 320 (S.D.N.Y. 1987) (finding that an attorney-client relationship between an arbitrator and counsel for one of the parties that ended more than a year prior to the arbitration proceeding did not militate in favor of vacatur of the award).

[61]    *Skyview*, 2004 WL 2244223, at *4 (quoting *Commonwealth Coatings*, 393 U.S. at 151).

[62]    *Sanko S.S. Co. v. Cook Indus., Inc.*, 495 F.2d 1260, 1263 (2d Cir. 1973).

-16-

satisfy the standard of 'evident partiality.'"[63]

In determining evident partiality, courts look to several factors: "(1) any financial interest the arbitrator may have in the proceeding; (2) the directness and nature of the alleged relationship between the arbitrator and a party to the proceeding; and (3) whether the relationship existed at the same time as the challenged proceeding."[64] "To set aside an award for arbitrator partiality, 'the interest or bias [of the arbitrator] . . . must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative.'"[65]

## B. Discovery

Because the main purposes of arbitration are to "settl[e] disputes efficiently and avoid[] long and expensive litigation," a party petitioning for discovery following an award must satisfy a high burden of proof to warrant the time and expense engendered by the discovery process.[66] Discovery is generally only permitted when "clear evidence of impropriety [on the part of the arbitrator]

[63]    *Sanford*, 665 F. Supp. at 320 (quoting *International Produce v. A/S Rosshavet*, 638 F.2d 548, 551 (2d Cir. 1981)).

[64]    *Id.*

[65]    *Id.* (quoting *Sidarma Societa Italiana di Armamento Spa v. Holt Marine Indus., Inc.*, 515 F. Supp. 1302, 1307 (S.D.N.Y. 1981)).

[66]    *Willemijn*, 103 F.3d at 12.

-17-

has been presented."[67]

## IV. DISCUSSION

### A. CASS Has Not Met Its Burden of Proof Concerning Hammond's Evident Partiality

CASS bases its assertion of partiality on two grounds: *first*, the allegedly improperly undisclosed relationships between the Thales Group and Hughes Hubbard, and *second*, Hammond's disclosure that Thales was in discussions with Hughes Hubbard regarding an unrelated matter.[68] With regard to this second ground, CASS asserts that the admission of Christine Guerrier, counsel for TTS, that "no retention was entered into [between Thales and Hughes Hubbard in June of 2005] due to the fact that the CASS arbitration had not been finally closed,"[69] implies that both Thales and Hughes Hubbard knew of the CASS arbitration and that it "may have been a significant feature of their discussions."[70]

None of CASS's assertions supports a finding of evident partiality. CASS has not asserted that Hammond had any direct financial interest in a TTS

---

[67]    *Andros*, 579 F.2d at 702.

[68]    *See* Hammond Letter, Ex. 8 to Weiner Decl. As previously noted, no retention had been entered into at the time of Hammond's letter to the ICC.

[69]    Guerrier Decl. ¶ 10.

[70]    Pet. Reply Mem. at 5.

-18-

victory, nor has it asserted that he displayed any direct partiality toward TTS during the Tribunal's deliberations. Instead, CASS has claimed that "Mr. Hammond's firm had a financial interest in the outcome of the CASS arbitration in the sense that Hughes Hubbard was actively pursuing Thales, the parent company to [TTS] as a client."[71] However, in order to set aside an award, this type of interest must be "direct, definite, and capable of demonstration rather than remote, uncertain, or speculative."[72] CASS has not shown this to be the case.

The first phone call between Hughes Hubbard and Thales occurred on or about June 8, 2005, when Andrew Hibbert contacted the Hughes Hubbard Paris office about serving as replacement counsel in a matter involving Thales Air Defence, one of Thales' subsidiaries.[73] Thales first became aware that replacement counsel for its subsidiary might be necessary in late April or early May of 2005, which was after the Interim Award had been received by the parties, and well after deliberations for it had concluded.[74] At that time, Guerrier, Thales' counsel, drew up a list of possible firms; Hughes Hubbard was not on this list "due to the

---

[71]    *Id.* at 4-5.

[72]    *Sanford*, 665 F. Supp. at 320.

[73]    *See* Guerrier Reply Decl. ¶¶ 5-7.

[74]    *See id.* ¶ 5.

-19-

pendency of the CASS arbitration."[75] After drawing up this list, Guerrier went on

vacation; when she returned in June, she learned that "on or about June 8, 2005,

Freshfields [Thales Air Defence's counsel] had withdrawn as counsel," and that on

or about the same date, "Hibbert had contacted the Paris office of Hughes Hubbard

about serving as replacement counsel."[76] Guerrier "immediately advised Mr.

Hibbert that since Steven Hammond was serving as an arbitrator" in the CASS-

TTS arbitration, "Thales Air Defence could not retain Hughes Hubbard as

counsel."[77]

Thus, it is clear that Thales did not contact Hughes Hubbard until

*after* the Arbitral Tribunal had concluded its deliberations, and that CASS is

unable to show any 'active' pursuit of Thales on Hughes Hubbard's part prior to

that date.[78] Rather, it appears that Thales had mistakenly contacted Hughes

Hubbard in June, and that even if that contact was improper, it was not only

---

[75]   *Id.*

[76]   *Id.* ¶ 7.

[77]   *Id.*

[78]   *See* Final Award ¶ 31 ("[T]he Arbitral Tribunal: (i) has no grounds to
conclude, and is aware of no evidence, that Mr. Hammond's firm had any
economic or other relationship with TTS or any of its affiliates before the
completion of the deliberations leading to an unanimous draft Interim Award, that
was achieved by the end of February 2005, or the rendition of such Interim Award
on April 6, 2005. . . . ").

-20-

inadvertent but also involved someone *other* than Hammond, the party whose impartiality is at issue here. This contact is too indirect and too insubstantial to warrant vacatur of the award,[79] and when Hammond discovered it, he disclosed it immediately. Additionally, CASS's allegation concerning the connection between Hibbert, who worked at Hughes Hubbard more than twenty years ago, and Hughes Hubbard's current chairwoman, as a result of their joint work at Alstom, is too insubstantial to warrant vacatur. The fact that Hibbert was employed by Thales was a matter of public record; no effort was made to hide it from CASS.[80]

Finally, CASS attempts to distinguish its claim from those in *Skyview* and *Sanford*, denying vacatur, by asserting that Hughes Hubbard's relationship with Thales was in fact contemporaneous with the pending CASS arbitration, and thus should have been disclosed.[81] However, the record does not support this assertion. Both the Guerrier Declaration and the Final Award – which was drawn up by the new Arbitral Tribunal, the impartiality of whose members has not been questioned by CASS – specifically refute CASS's claim that Thales contacted

---

[79]     *See* Skyview, 2004 WL 2244223, at \*20 (citing *Lucent v. Tatung*, 379 F.3d 24, 31 (2d Cir. 2004)).

[80]     *See* Guerrier Decl. ¶ 7.

[81]     *See* Pet. Reply Mem. at 6.

-21-

Hughes Hubbard at any point before February of 2005, when the deliberations for the Interim Award ended, or even April of 2005, when the Interim Award was issued.[82] Thus, any Thales-Hughes Hubbard relationship was not contemporaneous with the Arbitral Tribunal's decision-making process, and in fact no such relationship existed in June of 2005 for the very reason that the arbitration had not yet officially been closed.[83] CASS implies that Guerrier's statement is indicative of some extensive business relationship waiting in the wings to be brought to light after the official conclusion of the arbitration, but nothing in the record supports such an inference. Certainly business relationships begun after a first arbitration hearing may influence an arbitration process.[84] In

---

[82] *See* Guerrier Decl. ¶ 9 ("In June 2005 . . . I learned that one of Thales' other subsidiaries had contacted the Paris office of Hughes Hubbard in connection with a matter unrelated to the CASS arbitration."); Final Award ¶ 31 ("[T]he Arbitral Tribunal . . . has no grounds to conclude . . . that [Hughes Hubbard] had any economic or other relationship with TTS or any of its affiliates before the completion of the deliberations leading to an unanimous draft Interim Award . . . or the rendition of such Interim Award on April 6, 2005. . . . ").

[83] *See* Guerrier Decl. ¶ 10 ("Since the CASS arbitration had not yet been closed, the Thales subsidiary *did not retain Hughes Hubbard in June 2005*.").

[84] *See Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, No. 05 Civ. 10540, 2006 U.S. Dist. LEXIS 44789, at *20-21 (S.D.N.Y. June 28, 2006) (stating that "[i]t defies common sense to suggest that only the business relationships entered into before arbitration might affect the fairness of the arbitration process, and that any business relationships pursued or entered into after that first hearing would not have an influence on the arbitration

-22-

this case, however, the relationship may be characterized, at most, as fledgling; it began long after the tribunal had made its unanimous decision; and it was immediately disclosed. CASS has therefore failed to demonstrate any basis for vacating the arbitral award.

## B. CASS Has Not Demonstrated the Need for Further Discovery

CASS bases its request for further discovery in the form of an evidentiary hearing on its previous argument that the Guerrier Declaration shows that both Thales and Hughes Hubbard knew of the arbitration, and that it may have been a topic of their pre-retention discussions. But nothing in that Declaration supports the need for further discovery. Rather than "acknowledg[ing] the perception of bias,"[85] Guerrier's statements merely demonstrate that Thales was aware of the CASS/TTS arbitration, and of Hammond's role in that arbitration. Further, as TTS points out, if discussions of a potential relationship had in fact begun, CASS has produced no evidence demonstrating that Hammond was aware of them.[86] CASS's comparison of these circumstances to those in *Sanko S.S. Co.,*

process.").

[85]     Pet. Reply Mem. at 7.

[86]     *See* Respondent's Reply Memorandum of Law in Further Support of Motion to Confirm Arbitration Award at 8.

-23-

*Ltd. v. Cook Indus., Inc.* is misplaced. In *Sanko*, the Court of Appeals remanded for an evidentiary hearing on the scope of an arbitrator's relationship with a party because the district court had ignored evidence of a "substantial and continuing relationship" between the arbitrator and the party.[87] Here, by contrast, CASS has pointed to no such relationship between Hammond and TTS. Because CASS has made no showing of impropriety on Hammond's part, CASS's request for an evidentiary hearing is denied.

## V.    CONCLUSION

For the foregoing reasons, petitioner's motion to vacate the arbitration award is denied and respondent's cross-motion to confirm the arbitration award is granted. The Clerk of the Court is directed to close these motions (numbers 1 and 10 on the docket) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          July 13, 2006

---

[87]    *Sanko*, 495 F.2d at 1263.

-24-

## -Appearances-

### Counsel for Petitioner:

C. Stephen Heard, Esq.
Edmund M. O'Toole, Esq.
Gregory W. Gilliam, Esq.
VENABLE, L.L.P.
405 Lexington Avenue, 62nd Floor
New York, New York 10174
(212) 307-5500

### Counsel for Respondent:

Robert A. Weiner, Esq.
Carolyn Traister Schiff, Esq.
MCDERMOTT WILL & EMERY L.L.P.
340 Madison Avenue
New York, New York 10017
(212) 547-5363